IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | | |
|---|---|---|
| JTH TAX LLC, | ) | 1:23-CV-00005-RAL |
| | ) | |
| Plaintiff | ) | RICHARD A. LANZILLO |
| | ) | Chief United States Magistrate Judge |
| vs. | ) | |
| | ) | MEMORANDUM OPINION ON |
| MELISSA FOSTER, | ) | DEFENDANT'S MOTION TO DISMISS |
| | ) | FOR LACK OF SUBJECT MATTER |
| Defendant | ) | JURISDICTION AND FAILURE TO |
| | ) | STATE A CLAIM |
| | ) | |
| | ) | ECF NO. 11 |
| | ) | |

## I.    Introduction

Plaintiff JTH Tax LLC d/b/a Liberty Tax Service ("Liberty") commenced this action

against Defendant Melissa Foster d/b/a/ Foster Tax Services ("Foster") to enforce obligations

under a franchise agreement and four promissory notes. *See* ECF No. 1.  Liberty's Complaint

asserts four claims against Foster: violation of the Defend Trade Secrets Act of 2016, 18 U.S.C.

§ 1836, et seq. ("DTSA") (Count I), breach of contract (Count II), conversion (Count III), and

unjust enrichment (Count IV).  Foster has moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss

Liberty's Complaint for lack of subject matter jurisdiction and, alternatively, to dismiss certain

claims for failure to state a claim.  ECF Nos. 11, 12.  The motion has been fully briefed and

argued and is ripe for disposition. *See* ECF Nos. 16, 18, 20.  For the reasons discussed herein,

the motion will be granted in part and denied in part.[1]

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this
case, including entry of final judgment, as authorized by 28 U.S.C. § 636. *See* ECF No. 14.

## II.    Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a Rule 12(b)(6) motion to dismiss, the court must accept as true the complaint's factual allegations and view them in a light most favorable to the plaintiff. *See U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). The "court[] generally consider[s] only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim" when considering the motion to dismiss.[2] *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997)).

In making its determination under Rule 12(b)(6), the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004)). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Furthermore, a complaint should only be dismissed pursuant to Rule 12(b)(6) if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

While a complaint does not need detailed factual allegations to survive a motion to dismiss, it must provide more than labels and conclusions. *See Twombly*, 550 U.S. at 555. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v.*

---

[2] Liberty attached the following exhibits to the Complaint: Franchise Agreement (Ex. A, ECF No. 1-2), a 9.23.2015 Promissory Note (Ex. B, ECF No. 1-3), a 11.10.2015 Promissory Note (Ex. C, ECF No. 1-4), a 3.16.2017 Promissory Note (Ex. D, ECF No. 1-5), a 2.2.2018 Promissory Note (Ex. E, ECF No. 1-6), and a 6.9.2020 franchise agreement termination letter (Ex. F, ECF No. 1-7).

*Allain*, 478 U.S. 265, 286 (1986)).  Moreover, a court need not accept inferences drawn by a

plaintiff if they are unsupported by the facts as explained in the complaint.  *See California Pub.*

*Employee Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower*

*Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).  Nor must the court accept legal

conclusions disguised as factual allegations.  *See Twombly*, 550 U.S. at 555; *McTernan v. City of*

*York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) (noting that the "tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions").  Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated

the following three-step approach:

> First, the court must "tak[e] note of the elements a plaintiff must
> plead to state a claim." Second, the court should identify
> allegations that, "because they are no more than conclusions, are
> not entitled to the assumption of truth." Finally, "where there are
> well-pleaded factual allegations, a court should assume their
> veracity and then determine whether they plausibly give rise to an
> entitlement for relief."

*Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v.*

*Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).  This determination is "a context-specific

task that requires the reviewing court to draw on its judicial experience and common sense."

*Iqbal*, 556 U.S. at 679.

## III.  Material Facts

The Complaint alleges the following material facts, which the Court accepts as true for

purposes of the Defendant's motion:

### A.  The Franchise Agreement

Liberty is "one of the largest tax preparation franchises in the United States" and the

franchisor of its registered trademark "Liberty Tax Service."  ECF No. 1, ¶ 7.  Liberty developed

the "Liberty Tax Service System, which sells income tax preparation services and products to the public under Liberty's trademarks." *Id.*, ¶ 9. Liberty's franchise agreements grant franchisees "a limited license to identify as Liberty franchisees and use Liberty's confidential information and trade secrets."[3] *Id.*, ¶ 10. In exchange, "Liberty's franchisees pay monthly royalty and advertising fees and agree to various in-term and post-termination obligations."[4] *Id.*, ¶ 11.

On or about September 23, 2015, Foster entered into a franchise agreement (the "Agreement") with Liberty for the operation of a Liberty office in Grove City, Pennsylvania. In accordance with the Agreement, Foster received a "license to use Liberty's system, [trademarks ("Marks")], confidential information, and trade secrets; training from Liberty in franchise operations, marketing, advertising, and sales; and a copy of Liberty's confidential and proprietary Operations Manual...." *Id.*, ¶ 14. In exchange, Foster agreed to pay Liberty a monthly royalty calculated as percentage of its gross receipts, plus interest on any outstanding amounts. *Id.*, ¶ 15. Pursuant to Section 10 of the Agreement, Foster also "agreed not to directly or indirectly prepare or electronically file income tax returns or offer financial products except in her capacity as Liberty's franchisee during the term of the Agreement." *Id.*, ¶ 20.

Foster also committed to certain obligations "immediately upon termination of the Agreement" as well. *Id.*, ¶ 19. As stated in Section 9 of the Agreement, Foster agreed to:

---

[3] Liberty defines "Confidential Information" as "'including but not limited to client files, client information (such as names, phone numbers, social security numbers and other tax return information), operational methods, promotional plans[,] marketing strategies, pricing structures, business strategies, training material[,] and other proprietary trade secrets and know-how." ECF No. 1, ¶ 9.

[4] These obligations include, but are not limited to, "remitting prompt payment to Liberty of all monies due; using the Confidential Information only in connection with their Liberty franchise; refraining from competing with Liberty during the term of the franchise agreement; refraining from directly or indirectly providing tax preparation services within 25 miles of their Liberty territory for two years following termination of the franchise agreement; and transferring any lease interest and telephone number(s) associated with their Liberty franchise to Liberty upon termination." ECF No. 1, ¶ 11.

4

> (a) pay Liberty all monies due and owing; (b) transfer to Liberty all
> telephone numbers associated with her franchise; (c) assign to
> Liberty any interest in the lease for the franchise; (d) deliver all
> customer lists, tax returns, files, and records to Liberty; (e) return
> to Liberty all copies of the Operations Manual; (f) refrain from
> using and disclosing Liberty's Confidential Information; and (g)
> adhere to all post-term covenants not to compete or solicit."

*Id.*, ¶ 19.

Section 10 of the Agreement adds that, for two years following termination, Foster would not "directly or indirectly prepare or electronically file tax returns within her franchise territory or within 25 miles of the boundaries of same" or "solicit the patronage of any person or entity served by any Liberty office within the past twelve months for the purpose of offering income tax preparation, electronic filing services, or other financial products"; and Foster would "use good faith efforts to ensure that . . . no person or entity would offer tax preparation services at the location of her former Liberty franchise." *Id.*, ¶¶ 21, 23, 24. Foster also agreed "not to do any act that is, in Liberty's determination, harmful, prejudicial or injurious to Liberty ..." *Id.*, ¶ 25. And, "[i]n Section 12 of the Franchise Agreement, Foster agreed to refrain forever from interfering with or attempting to interfere with any of Liberty's business relationships or advantages" and "using or disclosing Liberty's confidential information and/or trade secrets," and to "maintain absolute confidentiality of all such information, and to adopt and implement procedures to prevent the unauthorized use or disclosure of same." *Id.*, ¶ 28.

Foster agreed that the covenants in Section 10 were "reasonable, valid and not contrary to the public interest," and would "survive any termination or expiration of th[e] Agreement." *Id.*, ¶¶ 26, 27. Foster also agreed "to waive all defenses to the strict enforcement of Section 10," and "that Liberty is entitled to a temporary restraining order, preliminary and/or permanent

injunction for any breach of duties under ... Sections 9 and 10." *Id.*, ¶ 26.  "Foster personally

guaranteed the Franchise Agreement." *Id.*, ¶ 29.

On May 27, 2020, Liberty learned that Foster had breached the Franchise Agreement by

"(1) failing to pay monies owed; (2) failing to open the franchise for business pursuant to the

schedule set forth in the Franchise Agreement; and (3) failing to actively operate her Liberty

office." *Id.*, ¶ 39.  On that same date, Liberty notified Foster of these breaches and her options to

cure them.  *Id.*, ¶ 40.  After Foster failed to cure the breaches, "Liberty terminated the Franchise

Agreement by way of a termination notice dated June 9, 2020 ('Termination Notice')." *Id.*, ¶ 41;

*see also* ECF No.1-6.  The Termination Notice reminded Foster of her post-termination

obligations.  *Id.*, ¶ 42; ECF No.1-6

> When the Franchise Agreement terminated in June 2020, Foster had not
>
> > (1) pa[id] to Liberty all past due accounts receivable debt and Note
> > balances; (2) transfer[red] to Liberty all telephone numbers
> > associated with her franchise; (3) deliver[ed] client information
> > and files Liberty; (4) return[ed] Liberty's confidential and
> > proprietary Operations Manual; (5) refrain[ed] from using Liberty's
> > Confidential Information, trade secrets and Marks; and (6)
> > adhere[d] to her post-termination non- competition and non-
> > solicitation obligations.

*Id.*, ¶ 43.

Liberty "recently discovered" that "Foster began operating Foster Tax on or prior to

January 20, 2020, while she was still a Liberty franchisee." *Id.*, ¶ 44.  Liberty also recently

discovered that "Foster openly solicited Liberty's clients during the 2020 tax season" and

"created the website www.fostertaxservices.com while she was still a Liberty franchisee." *Id.*,

¶¶ 45, 46.  Additionally, Liberty learned that from a December 2021 IRS database report that

Foster, as Foster Tax Services, submitted slightly more tax returns in 2021 "from the 118 S.

Center Street address" than Foster did the year before, "when she was a Liberty franchisee." *Id.*,

¶ 54.  Liberty recently learned that Foster Tax continued to provide tax services from this location in 2022.

Further, Foster Tax operates out of "the same location as that of Foster's former Liberty franchise" and "us[es] the telephone number associated with Foster's former Liberty franchise...." *Id.*, ¶ 47.  And, on the Foster Tax website, it states "that Foster Tax 'has serviced Mercer and Venango counties for nearly 5 years' and that, despite its name change, it 'continue[s] to offer the same friendly and accurate service.'" *Id.*, ¶ 51 (quoting https://fostertaxservices.com/?fbclid=IwAR0cmegk_8em17kd.HGqQ_RP9B- ffR.pi5JZHnR1 pQmDPfR:fj_TwIOw94QAUU (last accessed January 5, 2023)).

## B.  The Promissory Notes

Foster also executed four promissory notes payable to Liberty, the first in September 2015, the second in November 2015, the third in March 2017, and the fourth in February 2018 (collectively, "the Notes").  *See* ECF Nos. 1-3, 1-4, 1-5, 1-6.  Payments on the Notes were due between February 27, 2016 and February 28, 2018.  Each of the Notes stated that interest would accrue at a rate of 12% per annum and "set forth events that would constitute default."[5]  *Id.*, ¶¶ 34, 36.  Foster agreed to pay all attorneys' fees and other costs that Liberty may incur in enforcing the Notes.  *Id.*, ¶ 35.

As of the filing of the Complaint, Foster had not paid "Liberty for the amount owed in past due accounts receivable and unpaid note balances."  *Id.*, ¶ 38.  Interest continues to accrue on these debts.

---

[5] Events constituting default included "(a) any default in the payment of any installment or payment of principal, interest, or other amounts due and payable under this Note; ... (c) any default by Obligor in the performance of, or compliance with, any provision in this Note or other agreement, document or instrument to which any Obligor and Liberty are parties ..." *Id.*, ¶ 36 (quoting Ex. B, at p. 3; Ex. C at pp. 1-2, Ex. D at p. 1, Ex. E at p. 2).

IV.    **Legal Claims and Injunctive Relief**

The Complaint organizes Liberty's legal claims into four counts.  Each count includes related claims as follows:

- Count I for breach of contract asserts breaches of both the Franchise Agreement and the Notes.  As to the Franchise Agreement, Liberty identifies Foster's breaches as "(a) failing to pay amounts due and owing to Liberty; (b) failing to transfer the telephone number associated with her former Liberty franchise to Liberty and, instead, using the number in connection with Foster Tax to capitalize on its association with Liberty; (c) offering tax preparation services and submitting tax returns through Foster Tax at the same location as her former Liberty franchise, within the non-competition period; (d) failing to return the Operations Manual and using Liberty's trade secrets and Confidential Information to unlawfully compete with Liberty through Foster Tax; and (e) failing to use good faith efforts to ensure that, for two years after termination, no person or entity would offer tax preparation services at the location of her former Liberty franchise"; and, as to the Notes, Foster is alleged to have "failed to satisfy the amounts due thereunder."  ECF No. 1, ¶¶ 61, 63.

- Count II assets that Foster violated DTSA by "fail[ing] to return Liberty's Confidential Information following the termination of the Franchise Agreement"; and "using Liberty's Confidential Information and trade secrets during and after the termination of the Franchise Agreement to operate Foster Tax and divert revenue and clients from Liberty . . . for her own economic benefit …."  *Id.*, ¶¶ 78, 80.

- Count III asserts a conversion claim based on Foster's alleged "fail[ure] to return the Operations Manual" and "client lists/information or client records to Liberty," and "solicitation of Liberty's customers through Foster Tax."  *Id.*, ¶ 89.

- Count IV asserts a claim of unjust enrichment based on Foster's alleged "use and/or disclosure of the Confidential Information at Liberty's expense, as well as through her unlawful competition with Liberty."  *Id.*, ¶ 95.

Liberty seeks injunctive relief to enjoin Foster from:

- "offering tax preparation services within 25 miles of her former Liberty franchise territory for two years following the entry of injunctive relief";

- "diverting or attempting to divert any customer or business from Liberty . . . for a period of two years following the entry of injunctive relief";

- "solicit[ing] or endeavor[ing] to obtain the business of any person who shall have been a customer of the former Liberty franchise in the twelve months prior to the termination of the Franchise Agreement for a period of two years following the entry of injunctive relief"; and

- "from using Liberty's Confidential Information and trade secrets in perpetuity."

ECF No. 1, pp. 16-17.

Liberty also seeks an order of court directing "Foster to transfer the telephone number associated with her former Liberty franchise ... to Liberty" and "to deliver to Liberty any originals and all copies of the Operations Manual, customer lists and contact information, and customer tax returns and related files and records ...." *Id.*, p. 17.

## V.   Analysis

Foster's motion challenges the Court's subject-matter jurisdiction as well as the legal sufficiency and timeliness of Liberty's breach of contact claim for failure to pay the Notes, its conversion claim, and its request for injunctive relief.  The Court will address the subject-matter jurisdiction challenge before turning to the merits-based arguments.  *See Barclift v. Keystone Credit Servs.*, LLC, 585 F. Supp. 3d 748, 751–52 (E.D. Pa. 2022) (citing *Hollingsworth v. Perry*, 570 U.S. 693, 704–05 (2013) ("Before this Court can address the merits of any case, it must have subject-matter jurisdiction over the plaintiff's claims.").

### A.   While insufficient to establish diversity jurisdiction, the Complaint supports federal question jurisdiction.

Parties challenging a federal court's subject matter jurisdiction typically move for dismissal pursuant to Fed. R. Civ. P. 12(b)(1).  Although Foster's motion cites only Rule 12(b)(6), its challenge is facial rather than factual and, therefore, is treated like a Rule 12(b)(6) motion in that the court must assume that the Complaint's well-pleaded factual allegations are true.[6] *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016); *Hartig Drug Co. Inc. v. Senju*

---

[6] In contrast, a factual challenge "is an argument that there is no subject matter jurisdiction because the facts of the case ... do not support the asserted jurisdiction."  This challenge "allows the defendant to present competing facts," *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014), and the court does not assume the truth of the plaintiff's factual allegations. *Davis*, 824 F.3d at 346.  During oral argument on the motion, Foster agreed that her

*Pharm. Co. Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016) (noting that a facial challenge "attacks the complaint on its face without contesting its alleged facts"). Whether the challenge is facial or factual, however, it is the plaintiff who bears "the burden of persuasion" to demonstrate the existence of subject matter jurisdiction as opposed to the defendant's burden when challenging the sufficiency of the plaintiff's allegations to state a claim under Rule 12(b)(6). *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991) (citing *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Indeed, as the party asserting jurisdiction, Liberty "bears the burden of showing that the case is properly before the court at all stages of the litigation." *Packard v. Provident Nat. Bank*, 994 F.2d 1039, 1045 (3d Cir. 1993) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).

The Complaint invokes this Court's subject-matter jurisdiction based on both diversity of citizenship under 28 U.S.C. § 1332 and federal question jurisdiction pursuant to 28 U.S.C. § 1331. ECF No. 1, ¶¶ 4-5. Foster argues that the Complaint does not support either basis for jurisdiction.

Under 28 U.S.C. § 1332, federal district courts have original jurisdiction of civil actions between "citizens of different states" where "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs…" Section 1332 requires "complete diversity," which means "that, in cases with multiple plaintiffs or multiple defendants, no plaintiff be a citizen of the same state as any defendant." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010) (citing *Exxon Mobil Corp. v. Allapattah Svcs. Inc.*, 545 U.S. 546, 553 (2005); *Kaufman v. Allstate N.J. Insur. Co.*, 561 F.3d 144, 148 (3d Cir.2009)). "The key inquiry in establishing diversity is thus the 'citizenship' of each party to the action." *Id.* As a limited

---

challenge to subject matter jurisdiction was a facial attack.

10

liability company ("LLC"), Liberty is treated as a partnership for purposes of establishing citizenship. *Zambelli Fireworks*, 592 F.3d at 420. "Accordingly, the citizenship of [Liberty] is determined by the citizenship of its members." *Id.* And where, like here, "an LLC has, as one of its members, another LLC, 'the citizenship of unincorporated associations must be traced through however many layers of partners or members there may be.'" *Id.* (quoting *Hart v. Terminex Int'l*, 336 F.3d 541, 543 (7th Cir. 2003) (quotation omitted)).

Although the Complaint alleges that "Liberty is a Delaware limited liability company with its principal place of business in Hurst, TX" and that "Foster is a citizen of the Commonwealth of Pennsylvania," it does not state the citizenship of Liberty's member or members. *See* ECF No. 1, ¶¶ 1, 3. Therefore, the Complaint does not support complete diversity between Liberty and Foster. Liberty argues that complete diversity of citizenship is supported by the corporate disclosure it filed with the Court. *See* ECF No. 3. But "[a] basic requirement of pleading is that the jurisdiction of a federal court must appear on the face of the complaint." *Myslak v. Truck & Trailer Sales & Leasing Corp.*, 2007 WL 1450539, at *1 (M.D. Pa. May 15, 2007) (*Schultz v. Cally*, 528 F.2d 471, 474 (3d Cir. 1975). Accordingly, the Court cannot look beyond the face of Liberty's Complaint to ascertain the citizenship of its member LLC.

Liberty's Complaint, however, does support federal question jurisdiction under 28 U.S.C. § 1331(a) based on its DTSA claim and its supporting allegations regarding the nationwide extent of Liberty's business and its confidential information and trade secrets. "The DTSA provides a civil cause of action to '[a]n owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 354 (D.N.J. 2019) (quoting 18 U.S.C. § 1836(b)(1)). This "interstate commerce" requirement serves as the DTSA's

jurisdictional hook.  *See Gov't Emps. Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 172 (E.D. Pa.

2017) (listing cases).  But the DTSA's reference to "in commerce" is not as broad as the words

"involving commerce," or "affecting commerce" as those phrases are used in other statutes;

instead, "in commerce" covers "only persons or activities within the flow of interstate

commerce." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273 (1995) (emphasis

omitted); *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (holding that the term

"involving commerce" "encompasses a wider range of transactions than those actually 'in

commerce'—that is, within the flow of interstate commerce"); *Circuit City Stores, Inc. v. Adams*,

532 U.S. 105, 118 (2001) ("The plain meaning of the words 'engaged in commerce' is narrower

than the more open-ended formulations 'affecting commerce' and 'involving commerce'"); *Gulf

Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 195 (1974) (interpreting the "in commerce"

language to "denote only persons or activities within the flow of interstate commerce—the

practical, economic continuity in the generation of goods and services for interstate markets and

their transport and distribution to the consumer").  Thus, for Liberty's DTSA claim to support

federal question subject-matter jurisdiction under 28 U.S.C. §1331, the Complaint must allege

facts to support a direct nexus between its goods or services and interstate commerce.[7]  *See NJ

Coed Sports LLC v. ISP Sports, LLC*, 2023 WL 3993772, at *3 (D.N.J. June 14, 2023).

     Here, Liberty asserts that its "Tax Service system . . . sells income tax preparation

services and products to the public under Liberty's trademarks," and its franchised Liberty Tax

Service income tax preparation service centers are located throughout the United States.  ECF

---

[7] In contrast, some courts have taken the position that the DTSA's "interstate commerce" requirement is merely an element of the cause of action and not jurisdictional. *See e.g., Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585, 595 (E.D. Tex. 2021), *reconsideration denied*, 2021 WL 5003273 (E.D. Tex. Oct. 28, 2021), and *aff'd sub nom. Providence Title Co. v. Fleming*, 2023 WL 316138 (5th Cir. Jan. 19, 2023). Under this view, so long as a DTSA claim appears on the properly pleaded face of the complaint, subject-matter jurisdiction is satisfied. *Id.* Because the allegations of Liberty's Complaint satisfy the more rigorous jurisdictional standard followed by district courts in this Circuit, the Court need not analyze the appropriateness of the less demanding standard.

No. 1, ¶ 9.  Liberty further alleges that its nationwide franchisees "use Liberty's confidential information and trade secrets," which include "client files, client information," "operational methods, promotional plans marketing strategies, pricing structures, business strategies," and "training material." *Id.*, ¶ 10.  These allegations sufficiently demonstrate the required nexus between interstate commerce and Liberty's trade secrets and confidential information because, although Foster may serve only clients in Pennsylvania, the trade secrets and confidential information upon which Liberty bases its claims are alleged to be used directly in interstate commerce.  Accordingly, this Court has subject matter jurisdiction of this action pursuant to § 1331.  That being so, the Court may also exercise supplemental jurisdiction over Liberty's state law claims under 28 U.S.C. § 1337.[8]

## B.  Choice of Law for state law claims

Foster argues that Liberty's state law breach of the Notes claim and its conversion claims are barred by the statute of limitations, that its conversion claims are also barred by the "gist of the action" doctrine, and that its request for injunctive relief is barred by the doctrine of laches. As a threshold matter, the Court must determine which state's laws apply to each of these claims. "In a case based on federal question jurisdiction where a court is exercising supplemental jurisdiction over state law claims, the federal court applies the choice of law rules of the forum state." *Carlton v. Choicepoint, Inc.*, 2009 WL 4127546, at *5 (D.N.J. Nov. 23, 2009); *see also Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir.2006) ("we look to the choice of law rules of the state of Pennsylvania, because in an action based on diversity of citizenship jurisdiction, we must apply the substantive law of the state in which the District Court

---

[8] The Court will also grant Liberty leave to amend its Complaint to allege the citizenship of its constituent LLC members and any additional information it believes would support diversity of citizenship as an alternative basis for subject matter jurisdiction.

sat, including its choice of law rules"). Accordingly, the Court in this case must apply Pennsylvania's choice of law rules.

Liberty's claims arise out of the Agreement and the Notes, each of which includes a choice of law provision specifying Virginia law as governing all disputes arising out of the documents. *See* ECF Nos. 1-3, p. 4; 1-4, p. 3; 1-5, p. 3; 1-6, p. 3 (Notes); ECF No. 1-2, p. 24 (Agreement). Although Pennsylvania's choice-of-law rules generally honor contractual choice-of-law provisions, *see Perma-Liner Indus., Inc. v. U.S. Sewer & Drain, Inc.*, 630 F. Supp. 2d 516, 522 (E.D. Pa. 2008), "choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 (3d Cir.1991). *See also Federal Deposit Ins. Corp. v. Peterson*, 770 F.2d 141, 142 (10th Cir.1985) (absent an express statement of intent, a choice of law provision will not be interpreted as covering a statute of limitations). Accordingly, the Court will look to Pennsylvania law to resolve Foster's statute of limitations defense.

### C. The Complaint does not support a finding that Pennsylvania's statute of limitations bars Liberty's claims based on the Notes.

Foster argues that Pennsylvania's statute of limitations bars Liberty's claims for breach of the Notes. *See* ECF No. 12, pp. 3, 4. The expiration of the statute of limitations is an affirmative defense that the defendant must plead and prove. *See* Fed. R. Civ. P. 8(c)(1); *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989). *See also Marucci v. Lippman*, 406 Pa. 283, 177 A.2d 616, 617 (1962)). Normally, a defendant must raise the expiration of the statute of limitations as an affirmative defense in an answer to the complaint. *See Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002). The statute of limitations may be raised in a motion pursuant to Rule 12(b)(6) only "where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."

*Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n. 1 (3d Cir.1994). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Id.* (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)). "'The face of the complaint' has, in turn, been interpreted to mean the allegations contained in the complaint, matters of public record, 'materials embraced by the complaint, and materials attached to the complaint.'" *Houser v. Feldman*, 600 F. Supp. 3d 550, 563 (E.D. Pa. 2022) (citing *Hoffman v. Nordic Naturals, Inc.*, 837 F.3d 272, 280 n.52 (3d Cir. 2016).

Three Pennsylvania statutes of limitations have been posited as potentially applying to Liberty's claims to collect amounts due under the Notes. Foster argues that Pennsylvania's four-year statute of limitations for actions "upon a negotiable or nonnegotiable bond, note or other similar instrument in writing" governs these claims. 42 Pa. Const. Stat. § 5525(a)(7). *See Marcucci vh & L Devs., Inc.*, 2009 WL 5177767, at *7 (E.D. Pa. Dec. 31, 2009) (citing *Gordon v. Sanatoga Inn, Inc.*, 429 Pa. Super. 537, 632 A.2d 1352 (Pa. Super. Ct. 1993) (holding four-year statute of limitations in. § 5525(a)(7) applies to action to enforce a promissory note)). Liberty, on the other hand, argues that the Notes are "sealed instruments," subject to the twenty-year statute of limitations specified by 42 Pa. Const. Stat. § 5529(b)(1). Alternatively, Liberty contends that "the promissory notes can also be classified as negotiable instruments under Pennsylvania's Uniform Commercial Code, which would make them subject to a six-year statute of limitations" provided by 13 Pa Const. Stat. § 3104.[9]

---

[9] Pursuant to Pennsylvania's borrowing statute, "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim." 42 Pa. Const. Stat. § 5521(b). This provision, which is intended to discourage forum shopping, serves as an exception to applying the Pennsylvania statute of limitations where a claim accrues in another state where the limitation period is shorter. Neither party has asserted that Liberty's breach of the Notes claim accrued in a state other than Pennsylvania, and each party has argued based on the

Section 5525(a)(7) specifies that if an instrument is payable on demand, the four-year limitations period begins at the later of either the last payment or the demand of payment. *See Citizens Bank of Pennsylvania v. Lloyd*, 2015 WL 9588988, at *5 (Pa. Super. Ct. Dec. 29, 2015). Each of the Notes accrued on separate dates: the first, no later than March 1, 2018; the second, no later than February 28, 2016; the third, no later than March 17, 2018; and the fourth, no later than February 28, 2018. *See* ECF Nos. 1-3 – 1-6. Therefore, if the four-year statute of limitations of § 5525(a)(7) applies to Liberty's claims on the Notes, those claims would be barred because Liberty commenced this action on January 23, 2023, more than four years after the accrual date for the claim on each of the Notes.

The six-year limitations period provided by 13 Pa Const. Stat. § 3104 does not save the claims because the Notes do not qualify as "negotiable instruments" within the meaning of that provision. Section 3104(a) defines a negotiable instrument as "an unconditional promise or order to pay a fixed amount of money . . ." Pennsylvania law specifies that a promise or order is unconditional unless it contains: "(1) an express condition to payment; (2) that the promise or order is subject to or governed by another writing; or (3) that rights or obligations with respect to the promise or order are stated in another writing." 12 Pa. C.S. § 3106(a). *See also* U.C.C. § 3-106. That said, "[a] reference to another writing does not of itself make the promise or order conditional." *Id.* Here, however, the Notes are not unconditional promises because a holder would have to look to other documents to determine the amount owed on each Note. Each Note includes the following language directly beneath the amount owed:

> However, pursuant to Liberty's Automatic Payment Transfer
> program, all of the tax preparation, transmitter, software, and
> electronic filing fees, any rebates that the undersigned receives

---

application of Pennsylvania's statute of limitations. Therefore, the Court concludes that the borrowing statute does not apply in this case.

> from bank products or customers who purchase bank products and
> all other revenue due to the undersigned shall initially be paid to
> Liberty. From these fees, rebates and revenue, Liberty will deduct
> monies that the undersigned owes to Liberty and, if applicable,
> SiempreTax LLC ("SiempreTax") and deduct and hold monies to
> apply to upcoming amounts due to Liberty and/or Siempre/Tax,
> and remit any balance to the undersigned. All such payments shall
> be applied first to past-due interest outstanding and then to
> principal.

ECF Nos. 1-3, 1-4, 1-5, 1-6.  Thus, the amount the maker owes on each Note depends upon

payments Foster receives and remits to Liberty pursuant to transactions and obligations governed

by other agreements or documents.  As such, the maker's obligations, and the rights of the

holder, as to each Note cannot be determined from the four corners of the Note.  Accordingly,

the Notes are not negotiable instruments. *See Fed. Deposit Ins. Corp. v. Parkway Exec. Off.*

*Ctr.*, 1997 WL 535164, at *17 (E.D. Pa. Aug. 18, 1997) (the modified promissory note "cannot

be negotiable because it is subject to the other loan documents which contain additional rights

and obligations with respect to the promise" such that "[d]isbursements under the [Note] depend

on other agreements."); *PNC Bank v. Bolus*, 440 Pa. Super. 372, 378, 655 A.2d 997, 999 (1995)

("If the amount which Bolus owed under the note were determined by the Loan Agreement, then

the instrument would not be negotiable.").

    While § 5525(a)(7)'s four-year statute of limitations, if applicable, would bar Liberty's

claims on the Notes, and the limitations period for "negotiable instruments" does not apply to the

Notes, the Notes may be sealed instruments subject to the twenty-year statute of limitations of

§ 5529(b)(1).  "Whether an instrument is under seal or not is a question of law for the court, [but]

whether a seal placed on an instrument has been adopted by the maker as his seal is a question of

fact." *Wiley v. Brooks*, 2021 PA Super 190, 263 A.3d 671, 676 (2021) (quoting *Swaney v.*

*Georges Twp. Rd. Dist.*, 309 Pa. 385, 164 A. 336, 337-38 (1932)).  Under Pennsylvania law,

"when a party signs a contract which contains a pre-printed word 'SEAL,' that party has presumptively signed a contract under seal." *Beneficial Consumer Discount v. Dailey*, 644 A.2d 789,790 (Pa. Super. Ct. 1994). The opposing party may, however, put forth evidence to rebut this presumption. *See Marcucci v. H & L Devs., Inc.*, 2009 WL 5177767, at *6 (citing *Fed. Deposit Ins. Corp. v. Barness*, 484 F.Supp. 1134,1148 (E.D. Pa. 1980) ("The presence of the printed word '(Seal)' opposite defendant's signature on the promissory note gives rise only to a rebuttable presumption that defendant adopted the seal, thereby rendering the note a sealed instrument.")).

Here, Foster's signature appears on the signature line immediately following the words: "WITNESS the following signature(s) and seal(s)...". ECF Nos. 1-3, p. 3; 1-4, p. 4; 1-5, p. 3; 1-6, p. 4. The printed word "seal" and its conspicuous placement next to the signature line on each promissory note creates a presumption that the parties intended the Notes to be sealed when Foster signed each note. *See Marcucci v. H & L Devs., Inc.*, 2009 WL 5177767, at *6 (E.D. Pa. Dec. 31, 2009) (holding that document was sealed because it "contain[ed] the word 'SEAL' immediately to the right of both [makers'] signature"). As noted, however, this presumption is rebuttable. To do so, Foster must present evidence demonstrating that she did not intend the documents as sealed when she signed them.

Foster asserts that Liberty's use of "signature(s) and seal(s)" indicated its desire for Foster to "include a seal with her signature," and because she did not affix a seal to the Notes, she "clearly rejected that request." ECF No. 18, p. 4. This assertion is plausible, but whether it is sufficient to rebut the presumption cannot be determined based on the Complaint alone. If Foster fails to overcome the presumption, Liberty's claims on the Notes will survive Foster's statute of limitations defense, but if she is successful, the claims will be barred by the four-year

statute of limitations.  This determination will have to await a more developed record.

Accordingly, the motion to dismiss Liberty's claims on the Notes based on the statute of

limitations will be denied without prejudice to Foster's right to raise the defense on summary

judgment or at trial.

### D. Liberty's conversion claim is barred by Pennsylvania's two-year statute of limitations.

Foster also argues that Pennsylvania's statute of limitations bars Liberty's conversion

claim.[10]  Pennsylvania imposes a two-year statute of limitations on a cause of action for

conversion.  *See* 42 Pa. C. S. § 5524(3).  A cause of action generally "accrues, and thus the

applicable limitations period begins to run, when an injury is inflicted."  *Nicolaou v. Martin*, 195

A.3d 880, 892 (Pa. 2018).  Under Pennsylvania law, a conversion claim accrues when "there has

been a demand for the goods and a refusal to deliver."  *Fenton v. Balick*, 821 F. Supp. 2d 755,

761 (E.D. Pa. 2011) (quoting *Serafini v. Mariani*, 2010 WL 1342926, at *5 (M.D. Pa. Mar. 31,

2010) (citation omitted)).  *See Beadling v. Moore, 93 Pa. Super.* 544, 1928 WL 4454, *1 (Pa.

Super. 1928) ("demand and refusal are evidence of the conversion of property").  Stated

differently, a conversion claim "ar[ises] once a permissible possession bec[omes]

impermissible."  *Beltz v. Erie Indem. Co.*, 279 F. Supp. 3d 569, 584 (W.D. Pa. 2017), *aff'd*, 733

Fed. Appx. 595 (3d Cir. 2018) (citing *Fenton*, 821 F. Supp. 2d at 761).  And "[o]nce a cause of

action has accrued and the prescribed statutory period has run, an injured party is barred from

bringing his cause of action."  *Nicolaou*, 195 A.3d at 892.  Critically, "[t]he running of the

statute of limitations is not tolled by mistake, misunderstanding, or lack of knowledge."  *Id.*

---

[10] Virginia's statute of limitations for conversion is six-years. *See Mackey v. McDannald*, 298 Va. 645, 654, 842 S.E.2d 379, 384 (2020) (citing Code § 8.01-243(B)) (Conversion claims must "be brought within five years after the cause of action accrues."). Because this statute of limitations is longer than the Pennsylvania limitations period, the Pennsylvania borrowing statute does not apply.

Foster contends that Liberty's injury accrued "no later than June 10, 2020," when it "terminated the Franchise Agreement and demanded the 'immediate' return of its property…." ECF No. 12, p. 6. The Court agrees and finds that Liberty's conversion claim expired on June 10, 2022, more than seven months before Liberty initiated this action. Liberty argues that dismissal of the claim is inappropriate because "the factually intensive question remains of when Liberty discovered or reasonably should have known of Defendant's refusal to return the converted property." ECF No. 16, p. 9 (citations omitted). The Court finds this argument unavailing because, as noted, "[t]he running of the statute of limitations is not tolled by mistake, misunderstanding, or lack of knowledge." *Nicolaou*, 195 A.3d at 892. Moreover, that Foster had not returned the property pursuant to Liberty's demand was a fact well within Liberty's knowledge or, at least, a fact that Liberty should have known in the exercise of due diligence.

Under Pennsylvania's discovery rule, which tolls the statute of limitations until "the plaintiff knows, or reasonably should know, (1) that [the plaintiff] has been injured, and (2) that [his or her] injury has been caused by another party's conduct," *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991) (citation omitted), "a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *Serafini*, 2010 WL 1342926, at *6 (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (Pa. 1983) (citations omitted)). "[T]he reasonable diligence standard is objective, examining not what the plaintiff actually knew, but what a reasonable person facing the same circumstances confronting the plaintiff at the time in question would have known upon the exercise of reasonable diligence." *Nicolaou*, 195 A.3d at 892.

Here, Liberty cannot plausibly contend that it could not, in the exercise of reasonable diligence, have known that it had not received the property at issue. Liberty's Complaint acknowledges that its Termination Letter demanded that Foster "must **IMMEDIATELY** comply with the post-termination provisions of the Franchise Agreement, which include, but are not limited to" "transfer[ing] all telephone numbers . . . to Liberty"; *"deliver[ing] to Liberty all paper and electronic copies of [Foster's] customer lists, tax returns, files and records";* *transferring client files to the Hermitage, PA Liberty Tax Office; and "deliver[ing] to Liberty the Operations Manual and all updates."* ECF No. 1-7, p. 2 (emphasis added). The Termination Notice satisfied the demand element of Liberty's conversion claim. *See Serafini*, 2010 WL 1342926, at *6 (quoting *Rice v. Yocum*, 155 Pa. 538, 26 A. 698 (Pa. 1893) ("As early as 1893, the Pennsylvania Supreme Court acknowledged that '[a] demand in writing left at the defendant's house is sufficient.'"); *id.* ("Plaintiffs' April, 2007 letters would appear to satisfy the demand requirement, even though returned unopened"). Thus, Liberty's own pleading demonstrates that Foster's permissible possession of the property ended on June 9, 2020. *See Universal Computer Sys., Inc. v. Allegheny Airlines, Inc.*, 479 F. Supp. 639, 644–45 (M.D. Pa. 1979) ("[O]ne in possession of a chattel as bailee or otherwise who, on demand, refuses without proper qualification to surrender it to another entitled to its immediate possession, is subject to liability for its conversion."); *Serafini*, 2010 WL 1342926, at *6 ("the demand for the return of the stock . . . triggered the running of the statute of limitations.") (citation omitted); *Dranoff v. Merrill, Lynch, Pierce, Fenner & Smith*, 1986 WL 15014, at *1, *2 (E.D. Pa. Dec. 31, 1986) (because Defendant "ha[d] refused to return the stock or an amount of money equivalent thereto" that Plaintiff demanded "[i]n January, 1985," the court determined that "the cause of action for conversion . . . accrue[d] . . . January of 1985, when plaintiff Dranoff demanded the stock and

defendant Merrill Lynch refused to deliver it.").  Because the limitations period for Liberty's conversion claim expired on June 9, 2022, months before Liberty initiated this action, that claim is time-barred and will be dismissed.[11]

      **E.**  **Liberty's request for enforcement of the non-competition and non-solicitation covenants beyond their contractual expiration date is unsustainable under Virginia law, but its request for return of property may survive Foster's laches defense.**

Foster argues that Liberty may no longer obtain an injunction to enjoin her from engaging in competitive activities because both the non-competition and non-solicitation covenants of the Agreement have expired.  Foster further contends that Liberty's request for an injunction to compel the return of its property is barred by Pennsylvania's doctrine of laches.  The Court will address each argument in turn.

      **1.**  **Because no factor outside of Liberty's control caused its delay in filing this action, Virginia Law will not permit enforcement of the non-competition and non-solicitation covenants beyond their contractual expiration date.**

Foster argues that prospective enforcement of the Agreement's two-year non-competition and non-solicitation covenants is unavailable because Liberty did not file suit until after they had expired.[12]  By their terms, the two-year non-compete and non-solicitation covenants of the Agreement expired on June 9, 2022.  Liberty responds that its delay in seeking enforcement should be excused and the injunction should still issue because it only recently discovered

---

[11] Having found Liberty's conversion claim to be barred by the statute of limitations, the Court need not reach Foster's argument that it is also barred by the gist of the action doctrine.

[12] Pursuant to the Agreement, "Foster agreed that for two years following termination, she would not directly or indirectly solicit the patronage of any person or entity served by any Liberty office within the past twelve months for the purpose of offering income tax preparation, electronic filing services, or other financial products" or "provid[e] tax preparation services within 25 miles of their Liberty territory," and "to use good faith efforts to ensure that . . . no person or entity would offer tax preparation services at the location of her former Liberty franchise."  ECF No. 1, ¶¶ 11, 23, 24.

Foster's violation of the covenants. Both parties apply Virginia law to this issue, presumably based on the choice-of-law provision of the Agreement.

Under Virginia law, an injunction is "an extraordinary remedy," which the court, in its sound discretion, may grant based on "the nature and circumstances of the case." *Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 2d 852, 876–77 (E.D. Va. 2009) (citing *Levisa Coal Co. v. Consolidation Coal Co.*, 276 Va. 44, 662 S.E.2d 44 (2008)). Generally, a court may not issue a prospective injunction that extends beyond a covenant's expiration date. *See Preferred Systems Solutions, Inc. v. Gp Consulting, LLC*, 2011 WL 3681738, at *2 (Va. Cir. Ct. July 28, 2011). A prospective injunction may issue beyond the expiration date only "where the party seeking the injunction did not contribute unnecessarily to the delay that led to the expiration of the original covenant not-to-compete." *Id.* (citing *Roanoake Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 290 S.E.2d 882, 886 (1982)). Indeed, a Virginia court has issued an injunction beyond the contractual expiration date only where the delay in enforcement of the covenant was caused by a judicial backlog in reaching the merits of the plaintiff's claim and not due to the plaintiff's delay in filing suit. *See Roanoake*, 290 S.E.2d at 885-86. In *Roanoake*, the court deducted from the prospective injunction the six months the plaintiff delayed in filing suit because this portion of the delay could not be attributed to anything outside of the plaintiff's control. *Id.* Thus, the exception allowing a court to issue an injunction beyond the expiration of a non-competition covenant is a narrow one that has been invoked only where something outside of the control of the plaintiff caused the delay.

Here, Liberty contends that it only recently discovered that Foster had violated the covenants, but this is not a factor outside of Liberty's control. Furthermore, a delay of two years and seven months in and of itself reflects Liberty's lack of due diligence in monitoring and

enforcing its contractual rights.  Therefore, equity will not allow the Court to enjoin Foster's conduct in violation of the non-competition and non-solicitation covenants beyond the expiration of the covenants.  *See JTH Tax, Inc. v. Magnotte*, 2020 WL 4284056, at *4 (E.D. Mich. July 27, 2020) (holding that "[a] party's delay in filing suit is a dilatory action which will count against it when a court considers whether the party unnecessarily contributed to the delayed judgment").

### 2. Whether laches bars Liberty's claim for return of property cannot be determined based on the Complaint alone.

Liberty also seeks equitable relief to compel Foster to return certain of its property. Foster argues that the doctrine of laches bars this relief.  Both parties analyze this defense under Pennsylvania law.[13]  Therefore, the Court will do the same.  "Unlike the application of the statute of limitations, … the doctrine of laches does not depend on a mechanical passage of time." *Fulton v. Fulton*, 2014 PA Super 270, 106 A.3d 127, 131 (2014).  Instead, "[l]aches bars relief when the plaintiff's lack of due diligence in failing to timely institute an action results in prejudice to another." *Commonwealth ex rel. Pennsylvania Att'y Gen. Corbett v. Griffin*, 596 Pa. 549, 563 (2008).   Thus, to prevail on a laches affirmative defense, "[the defendant] must establish both undue delay from [the plaintiff's] failure to exercise due diligence and prejudice resulting from the delay." *DiLucia v. Clemens*, 373 Pa. Super. 466, 473 (1988) (citing *Nicholson Co. v. Pennsy Supply, Inc.*, 362 Pa. Super. 307 (1987)).  *See also Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 134 (3d Cir. 2000) ("Under Pennsylvania law, the doctrine of laches has two elements: (1) inexcusable delay; and (2) prejudice") (citations omitted)).

---

[13] Presumably, the parties regard the doctrine of laches as comparable to a statute of limitations defense and therefore subject to the laws of the forum state.  In any event, no conflict exists between Virginia and Pennsylvania's approach to the doctrine of laches.  *See e.g.*, *Willems v. Batcheller*, 78 Va. App. 199, 223 (2023) (quoting *Stewart v. Lady*, 251 Va. 106, 114 (1996)) ("Laches is a defense against equitable claims where the plaintiff fails 'to assert a known right or claim for an unexplained period of time under circumstances prejudicial to the adverse party.'").

A defendant may show prejudice "by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible." *Kern v. Kern*, 892 A.2d 1, 9 (Pa. Super. 2005). Prejudice may also be found where "relevant records have disappeared, ... a key witness is now deceased, or cannot be located, or ... the defendant changed his position based on the expectation that plaintiff did not intend to pursue the claim.'" *Fulton v. Fulton*, 2014 PA Super 270, 106 A.3d 127, 134–36 (2014) (citing *Del–Val Electrical Inspection Service, Inc. v. Stroudsburg–East Stroudsburg Zoning and Codes Office*, 100 Pa. Cmwlth. 429, 515 A.2d 75, 76 (1986) (citation omitted))). Thus, "[t]he question of laches is factual and is determined by examining the circumstances of each case." *Griffin*, 596 Pa. at 563 (quoting *Weinberg v. State Bd. of Exam'rs. of Pub. Accountants*, 509 Pa. 143, 148, 501 A.2d 239, 242 (1985) (citation omitted)).

Foster argues that "[b]ecause the statute of limitations applicable to the conversion claim has expired, the equitable relief flowing from that claim is also presumptively barred by the doctrine of laches." ECF No. 12, p. 9. In other words, Foster argues that Liberty may no longer obtain an order requiring it to return Liberty's property. Foster is correct that "if the statute of limitations has expired, a defendant enjoys the presumption of inexcusable delay and prejudice." *Highland Tank & Mfg. Co. v. PS Int'l, Inc.*, 393 F. Supp. 2d 348, 357 (W.D. Pa. 2005) (citing *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3rd Cir. 2005). But the presumption is rebuttable. In effect, the burden shifts to the plaintiff to "show that the delay was excusable and that the defendant was not prejudiced." *Id.*

As the Court has already noted, Liberty cannot reasonably contend that it was unaware of Foster's failure to return its property in accordance with the Agreement and Liberty's Termination Notice, and its delay of two years and seven months in the commencement of this

action reflects a lack of due diligence in monitoring and enforcing its contractual rights. Nevertheless, the equities relating to Liberty's request for return of its property differ somewhat from those associated with its request for enforcement of the non-competition covenants beyond their contractual expiration. In addition to inexcusable delay, the laches defense also asks whether Foster has suffered prejudice because of that delay. Liberty's request for return of property is relatively simple and straightforward such that it is questionable whether its timing could materially affect matters of proof. If Foster retains certain materials belonging to Liberty and to which Foster does not have an independent right of ownership or possession, it is unlikely that the delay in requesting the Court to compel their return would prejudice Foster in any significant way. Accordingly, Liberty may be able to rebut the presumption of prejudice sufficient to overcome Foster's laches defense as to this discrete request for equitable relief. This is not an issue the Court can determine based on the allegations of the Complaint alone. This determination will have to await a more developed record. Accordingly, Foster's motion to dismiss this aspect of Liberty's claim for equitable relief will be denied without prejudice to Liberty's right to raise the defense on summary judgment or at trial.

## VI.    Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim (ECF No. 11) is GRANTED in part and DENIED in part. The motion is granted as to Liberty's conversion claim (Count III) and its request for injunctive relief to enforce the non-competition and non-solicitation covenants of the Agreement, and those claims are dismissed with prejudice. In all other respects, the motion is DENIED.

DATED this 12th day of September, 2023

BY THE COURT:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE